# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 23, 2013

## STATE OF TENNESSEE v. TONY ERIC PICKETT, JR.

### Direct Appeal from the Criminal Court for Hamilton County
### No. 279866    Don W. Poole, Judge

### No. E2012-01383-CCA-R3-CD - Filed September 27, 2013

A Hamilton County Criminal Court Jury found the appellant, Tony Eric Pickett, Jr., guilty of evading arrest, a Class E felony.  The trial court sentenced the appellant as a career offender to six years in the Tennessee Department of Correction.  On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction and the trial court's failure to instruct the jury on misdemeanor evading arrest.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and JEFFREY S. BIVINS, JJ., joined.

Zachary Newman (on appeal) and David Barrow (at trial), Chattanooga, Tennessee, for the appellant, Tony Eric Pickett, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William H. Cox, III, District Attorney General; and Cameron Williams, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

A Hamilton County Grand Jury returned a multi-count indictment against the appellant, charging him with two counts of aggravated assault, one count of felony evading arrest, one count of felony vandalism, and one count of driving on a revoked license.  The State voluntarily dismissed the aggravated assault and driving on a revoked license charges and proceeded to trial on the felony evading arrest and vandalism charges.

At trial, Chattanooga Police Officer Chad Rowe testified that he worked in the department's fugitive warrants division. At approximately 10:00 a.m. on January 19, 2011, he and his partner, Officer Robin Davenport, went to the appellant's mother's residence at 2300 Bailey Avenue to serve warrants on the appellant. Officer Rowe drove an unmarked, dark blue, 2009 Ford F-150 that was equipped with eight lights in the grill, one in the front window, and two in the back window. There were strobe lights in the back lights and on the car door light. There was also a siren in the front grill. Officers Rowe and Davenport wore "civilian clothes," a tactical vest with "police" written across the front and back, a tactical belt with a "drop-down holster," and a clearly visible badge next to his pistol against his leg.

Officer Rowe said that when they pulled into the alleyway behind the Bailey Avenue residence, they saw a white Chevrolet Impala parked facing the residence with the engine running and the driver's side door open. Officer Rowe thought it was suspicious that no one was near the car, and he parked on the left side of it. Around three minutes later, the appellant came out of the residence. Officer Rowe opened the door and put one foot outside the vehicle, but Officer Davenport stopped him from exiting completely. The appellant made eye contact with the officers and got into the Impala. Officer Rowe maneuvered his vehicle behind the Impala. The appellant "started pulling up and back trying to position his car where he could come around and [Officer Rowe] could drive forward." Officer Rowe activated his front lights, back lights, and siren, and he backed up so the appellant could not get into the alleyway. As the appellant attempted to maneuver his vehicle around the truck, the front right side of his vehicle struck the right rear of Officer Rowe's truck, knocking the driver's side into a fence and telephone pole and breaking the side mirror. The appellant exited the alleyway, heading south then east. Officer Rowe backed out of the alley, turned in the street, and pursued the appellant for two blocks before losing sight of him.

Officer Rowe said that later the same day, the Impala was found by another officer on East 52nd Street. The vehicle was registered to Jennifer McCrary.

Officer Rowe said that he found the appellant at approximately 5:00 p.m. on January 21, 2011, at 3495 Chandler Place, which was the two-story apartment of Erica Bonds. Officer Rowe and several marshals went into the residence and, after approximately one hour, found the appellant in the attic.

On cross-examination, Officer Rowe acknowledged that his truck was designed to look like a civilian vehicle in order to execute fugitive warrants by surprising people. The truck had a football fan tag on the front and emergency equipment that was not visible unless engaged. Officer Rowe said that he parked behind the residence next door to the appellant's mother's residence because he could not see the house numbers from the alley.

Officer Rowe said that when the appellant came out of the residence, he paused for a second and looked at the officers. Officer Rowe thought the appellant saw them "because the police on our tact vest is like probably at least that wide of letters, and from the truck, you can see, like if I was parked at the door back there facing this way, I mean unless it's dark or in the evening time or something, that's visible." After seeing the officers, the appellant quickly walked to the car, jumped in, and immediately put the car in gear to leave. By the time the appellant started turning around, Officer Rowe had activated his lights and siren to stop him. Officer Rowe acknowledged that the lights were in the front and rear of his vehicle and might not have been visible from the side; however, he asserted that the siren was also activated before the appellant struck his truck.

Officer Rowe explained that he did not completely exit his truck and did not yell for the appellant to stop. He said that after the appellant saw the officers, he got into the car quickly. Officer Rowe did not attempt to chase the appellant on foot because he felt safer in his truck. Officer Rowe said:

> Since I blocked him in and stuff, if he hadn't have started going forward and backwards and stuff, I probably would have gotten out of my vehicle since I'd have figured he was blocked in, but then once he tried to turn or did turn around when he was going back and forth, I thought, well, he's fixing to try to flee, so that's why I turned everything on, the lights and siren.

Officer Rowe acknowledged that as the appellant turned his vehicle, he was at a side angle to Officer Rowe's truck and might not have been able to see his blue lights. However, the siren was blaring.

Don Sneed, owner of Don Sneed Appraisals, testified that he examined Officer Rowe's vehicle after it was hit. He estimated that the repairs to the vehicle would cost $4503.11.

Officer Robin Davenport testified that at approximately 10:00 a.m. on January 19, 2011, he and Officer Rowe drove an unmarked Ford F-150 truck to the residence of the appellant's family at 3212 Bailey Avenue to serve a warrant on the appellant. Both men were wearing tactical gear consisting of plain clothes topped with a vest bearing the word "police" in two-inch letters, a "drop holster," and a badge on the belt. Officer Davenport said he had previously had face-to-face contact with the appellant.

Officer Davenport said that when they arrived, they turned into an alleyway behind the residences on Bailey Avenue. They saw an unoccupied Chevrolet Impala parked outside

-3-

with the engine on and the driver's side door open. When Officer Rowe opened his door to investigate the vehicle, the appellant stepped out of the back of the residence where the vehicle was parked. As he was walking down the stairs, he looked at the officers' truck. The appellant immediately got into the car and put it in reverse. Officer Rowe closed the door, and Officer Davenport told him to maneuver the truck to block the appellant's vehicle. The appellant put his car in drive and drove through the yard. Officer Rowe activated the truck's blue lights and siren.

Officer Davenport said that Officer Rowe was traveling in reverse when the appellant turned around. Officer Rowe tried to block the appellant to keep him from getting into the alley. The front passenger side of the appellant's car hit the rear passenger side fender of Officer Rowe's truck, pushing the truck into a utility pole and fence line. The appellant sped away. Officer Rowe backed up the truck and pursued the appellant but was unable to apprehend him. The officers returned to Bailey Avenue and spoke with the appellant's mother. Thereafter, Officer Davenport spoke with the appellant over the telephone. He told the appellant to return to the scene. The appellant responded that "he didn't know what was going on and that he wasn't coming back." When Officer Davenport advised the appellant that there were warrants against him, the appellant said that the officers "would have to catch him."

Officer Davenport said that the police arrested the appellant two days later in Erica Bonds' attic.

On cross-examination, Officer Davenport stated that he and Officer Rowe drove an unmarked car to "steathfully" make fugitive arrests. He stated that ordering the appellant to stop would have been pointless because he got in the car so quickly. As the appellant was driving through the yard, Officer Rowe activated his emergency lights and siren. The officers pursued "right behind" the appellant.

The appellant's mother, Penny Collier, testified as the first defense witness that the appellant came by her residence around 7:15 a.m. on January 19, 2011. Collier asked the appellant if she could borrow his girlfriend's Impala to run some errands. The appellant agreed and said he would take a shower while Collier was gone. Around 9:00 a.m., after Collier returned with the car, the appellant left the house. He came back in briefly to look for his hat then went back outside. Shortly after the appellant walked out the door, Collier heard a noise and looked outside. She saw a truck traveling through the grass in an empty field by her house. The appellant was nowhere in sight. Collier and her daughter ran outside, saw flashing lights on the rear of the truck, and discerned that the truck was being driven by the police. Collier denied hearing a siren. She stated that there were black marks on the Impala's bumper at least a couple of months before the incident with the police.

-4-

On cross-examination, Collier said that the appellant did not live with her at the Bailey Avenue address but that he occasionally visited. Both Collier and the appellant knew he had outstanding warrants for his arrest. On the day of the incident with police, Collier spoke with the appellant about turning himself in to the police.

Collier said that before the appellant left her house that morning, he looked out the window and saw a truck. Collier also looked out the window and saw the truck parked next door to her house. She could not see anyone in the truck because the side windows were tinted; however, she acknowledged that the windshield was not tinted. Shortly after the appellant left the house, Collier heard a sound "like somebody was chasing" the appellant, and she called him. A few seconds later, Collier ran out of the back door and saw the truck speeding through the yard. Collier thought the police were chasing the appellant because she heard a certain sound, which she demonstrated for the jury, and she saw the flashing lights. Collier denied hearing a siren.

The appellant testified that he had two children and that McCrary was his girlfriend. He said that on January 19, 2011, he went to Collier's house. She asked to borrow the car, and he agreed. The appellant stayed at her house to shower and change his clothes. After Collier returned, the appellant went outside, got in his car, and realized he did not have his hat. He returned to the house but could not find the hat. When he went back outside, he saw a truck drive into the alley, but he could not see anyone inside the truck. The appellant said that someone who lived nearby drove a similar truck so he "didn't pay the truck no mind." He got into his car and put it in reverse. The car started to stall, and the truck drove closer. He tried to get away from the truck by driving off, but he heard the sound of the truck pursuing him. He did not hear a siren or see flashing lights. The appellant denied hitting the truck. Soon thereafter, the appellant lost sight of the truck.

When the appellant was asked who he thought was in the truck, he stated:

> I don't know, I didn't know what was going on. Only thing I knew was – I didn't know, because if it wasn't an officer or anything of that nature, I don't know who it could have been.

The appellant acknowledged that he had an outstanding warrant but asserted that the police had never approached him in that way. He said the police usually surrounded his house with police cars. Shortly after the appellant left the house, Collier called him and asked what was happening, and the appellant replied that he did not know. Collier said, "Oh, that's the damn police." The appellant did not know why the police were trying to hit his car. When he got to his cousin's house, he spoke with the police over the telephone. Officer Davenport told the appellant to turn himself in, and the appellant asked why the officers tried to hit his

vehicle. Officer Davenport responded, "You don't worry about that because you facing felony charge. You were facing misdemeanor charge, now you facing felony charge." The appellant got "shook up" and hung up on Officer Davenport.

The appellant said that he knew the officers from a previous arrest. He explained that the officers had never pursued him in that manner and that he did not turn himself in because he was scared.

The appellant stated that he got the car in 2008, that the marks had been on the car since 2009, and that he did not fix it because he did not have the money.

On cross-examination, the appellant acknowledged that prior to his previous arrests, the police had activated their emergency lights and siren. He further acknowledged that he had previously been arrested by Officers Rowe and Davenport. He denied, however, knowing that the officers were in the truck that day. The appellant spoke with Officer Davenport over the telephone approximately fifteen minutes after the incident. On January 15, 2011, the appellant learned that there was an outstanding warrant for his arrest.

Jennifer McCrary testified that the appellant was her boyfriend and that they had a daughter together. She stated that in 2009, her Impala was damaged in a wreck. The damage had not been repaired at the time of the incident with the police.

The jury found the appellant guilty of felony evading arrest and not guilty of vandalism. The trial court sentenced the appellant as a career offender to six years. On appeal, the appellant challenges the sufficiency of the evidence supporting his conviction and the trial court's failure to instruct the jury on misdemeanor evading arrest as a lesser-included offense of Class E felony evading arrest.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the

evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proved, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

Tennessee Code Annotated section 39-16-603(b)(1) provides that "[i]t is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop" The offense "is a Class E felony unless the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties." Id. at (b)(3).

The appellant alleges that the proof at trial was not sufficient to establish that he knew the truck was being driven by law enforcement officers or that the officers were attempting to stop him. However, in the light most favorable to the State, the proof adduced at trial reveals that the appellant made eye contact with the officers when he exited his mother's house. The appellant knew the officers because they had previously arrested him. Additionally, the appellant knew there was at least one outstanding warrant against him. The appellant ran to his car and attempted to leave. The officers activated their blue lights and siren. Attempting to escape, the appellant struck the officers' truck hard enough to cause substantial damage. The officers pursued the appellant but lost sight of him. Shortly thereafter, the appellant spoke with the officers on the telephone and told them that they would have to catch him, and he refused turn himself in to the police. The officers were able to apprehend the appellant two days later. We conclude that the evidence is sufficient to sustain the appellant's conviction for felony evading arrest.

B. Jury Instruction

As his final issue, the appellant contends that the trial court erred by failing to instruct the jury on misdemeanor evading arrest as a lesser-included offense. Generally, a trial court has a duty to instruct the jury on the charged offense(s) and any lesser-included offenses. See

Tenn. Code Ann. § 40-18-110; State v. Burns, 6 S.W.3d 453, 464 (Tenn. 1999). Tennessee Code Annotated section 40-18-110(a) and (b) provides that a party in a criminal case must submit to the trial court in writing a request for a lesser-included offense instruction and that in the absence of such a request, the party is not entitled to the instruction. Further, when the request for a lesser-included offense instruction is not made in writing, the issue is waived and may not be presented as a ground for relief in a motion for new trial or on appeal. Tenn.Code Ann. § 40-18-110(c). The appellant acknowledges that he did not request the instruction and asks that this court address the issue as plain error.

Tennessee Rule of Appellate Procedure 36(b) provides that "[w]hen necessary to do substantial justice, [this] court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." See also Tenn. R. Evid. 103(d). We may only consider an issue as plain error when all five of the following factors are met:

> a) the record must clearly establish what occurred in the trial court; b) a clear and unequivocal rule of law must have been breached; c) a substantial right of the accused must have been adversely affected; d) the accused did not waive the issue for tactical reasons; and e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "plain error must be of such a great magnitude that it probably changed the outcome of the trial." Adkisson, 899 S.W.2d at 642 (internal quotations and citation omitted).

"In applying the lesser-included offense doctrine, three questions arise: (1) whether an offense is a lesser-included offense; (2) whether the evidence supports a lesser-included offense instruction; and (3) whether an instructional error is harmless." State v. Allen, 69 S.W.3d 181, 187 (Tenn. 2002). Our supreme court has outlined the following test for determining when an offense may be considered a lesser-included offense of an indicted offense:

> An offense is a lesser-included offense if:
>
> (a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

> (1) a different mental state indicating a lesser kind of culpability; and/or

> (2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

> (1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

> (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

> (3) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

Burns, 6 S.W.3d at 466-67.

Tennessee Code Annotated section 39-16-603(b)(1) provides:

> (a)(1) Except as provided in subsection (b), it is unlawful for any person to intentionally flee by any means of locomotion from anyone the person knows to be a law enforcement officer if the person:

> (A) Knows the officer is attempting to arrest the person; or

> (B) Has been arrested.

> . . . .

> (3) A violation of subsection (a) is a Class A misdemeanor.

(b)(1) It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop.

. . . .

(3) A violation of subsection (b) is a Class E felony unless the flight or attempt to elude creates a risk of death or injury to innocent bystanders or other third parties, in which case a violation of subsection (b) is a Class D felony.

This court has previously held that misdemeanor evading arrest is not a lesser included offense of Class D felony evading arrest under Burns. See State v. Gregory Dunnorm, No. E2001-00566-CCA-R3-CD, 2002 WL 1298770, at *11 (Tenn. Crim. App. at Knoxville, June 12, 2002). Specifically regarding part (b) of the Burns test, this court has concluded that the offenses require the same mental state and that misdemeanor felony arrest does not present a less serious harm or risk of harm than the felony offense. Id. This court additionally concluded that the statutes address different concerns because misdemeanor evading arrest may be committed on public or private property and felony evading arrest must be committed on a public roadway. Id. We conclude that the same analysis applies when considering whether misdemeanor evading arrest is a lesser-included offense of Class E felony evading arrest. Moreover, we note that when the trial court gave defense counsel the opportunity to orally request any lesser-included offense instructions, defense counsel responded, "There's no lower evading, to my knowledge." Accordingly, we conclude that the trial court did not err in refusing to instruct the jury on misdemeanor evading arrest.

### III. Conclusion

In sum, we conclude that the evidence was sufficient to sustain the appellant's conviction and that the trial court did not err in not instructing the jury on misdemeanor evading arrest. Therefore, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE